IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 19-cv-1242-WJM-KMT

WALTER STRICKLIN, an individual,

    Plaintiff,

v.

BROCK BORDELON, M.D., an individual,
MATTHEW BURKHOLDER, P.A.-C, an individual,
JOHN WILLIAMS JR., M.D., an individual,
NICOLE MASON, R.N., an individual,
BARBARA CARRIS, R.N., an individual
SARAH MEYER, an individual,
CATHOLIC HEALTH INITIATIVES COLORADO,
d/b/a PENROSE HOSPITAL, a Colorado corporation,

    Defendants.

## ORDER DENYING PLAINTIFF'S MOTION TO AMEND THE COMPLAINT

This matter is before the Court on Plaintiff Walter Stricklin's November 27, 2019 Motion to Amend the Complaint (the "Motion") (ECF No. 42). Defendant Brock Bordelon ("Bordelon") filed a Response to the Motion (the "Response") on December 11, 2019 (ECF No. 45), and Plaintiff filed a Reply on December 16, 2019 (ECF No. 46). For the reasons that follow, the Motion is denied.

### I. BACKGROUND

**A.**     **Plaintiff's Original Complaint**

On April 29, 2019, Plaintiff filed a Complaint against the above-captioned Defendants (ECF No. 1). Plaintiff's claims arise from an incident that occurred during a

surgery performed on January 17, 2018 at Defendant Penrose Hospital ("Penrose"), during which all individual Defendants were present in the operating room ("OR"). (*Id.*)

In the Complaint, Plaintiff alleges as follows: On January 17, 2018, Plaintiff was admitted to Penrose for a planned outpatient laparoscopic hernia surgery. (*Id.* ¶ 17.) Plaintiff was 63 years old at the time of this surgery, is a retired firefighter, and currently works as an Occupational Health and Safety Administration safety officer. (*Id.* ¶ 18.)

Bordelon is a surgeon licensed to practice medicine in the state of Colorado, and was the "primary surgeon" for Plaintiff's hernia surgery. (*Id.* ¶¶ 3, 19.) Defendant Burkholder ("Burkholder") is a physician assistant certified to practice medicine in the state of Colorado, and was the "assisting surgeon" for Plaintiff's surgery. (*Id.* ¶¶ 4, 19.) Defendant Williams ("Williams") is an anesthesiologist licensed to practice medicine in the state of Colorado, and was the anesthesiologist for Plaintiff's surgery. (*Id.* ¶¶ 5, 19.) Defendants Mason ("Mason") and Carris ("Carris") are registered nurses certified to practice nursing in the state of Colorado, are employees of Penrose, and were the nurse circulators for Plaintiff's surgery. (*Id.* ¶¶ 5–6, 20–21.) Defendant Meyer ("Meyer"), also an employee of Penrose, was the OR technician for Plaintiff's surgery. (*Id.* ¶¶ 3, 20–21.) At all times relevant to this action, Defendants "held [themselves] out as and warranted [themselves] to the public as . . . competent, careful, and experienced" in their respective fields. (*Id.* ¶¶ 3–8.)

Plaintiff was positioned on the operating table by Bordelon, Williams, Carris, and Mason. (*Id.* ¶ 22.) Plaintiff was initially positioned "supine" (*i.e.*, on his back) on the operating table. (*Id.* ¶ 24.) Plaintiff's position was "verified by Bordelon and Williams."

(*Id.* ¶ 22.) Plaintiff was placed under general anesthesia and thereby rendered unconscious for his surgery. (*Id.* ¶ 23.)

Bordelon then commenced surgery. (*Id.* ¶ 24.) Bordelon inserted multiple trocars (*i.e.,* "sharp-pointed surgical instrument[s] . . . used to puncture the wall of a body cavity and withdraw fluid")[1] into Plaintiff's abdomen, insufflated the abdomen with carbon dioxide, and began attempting to repair Plaintiff's hernia. (*Id.* ¶ 25.) At some point during the surgery, Plaintiff was rolled to his right and placed into "a slight Trendelenburg position, a position in which the body is laid supine and the head lower than the feet by 15 to 30 degrees." (*Id.* ¶ 26.) From the Trendelenburg position, Plaintiff fell off of the operating table to his right, with a needle and a piece of mesh still in his abdomen. (*Id.* ¶ 27.) Plaintiff fell face-first onto the floor and into the IV stand. (*Id.* ¶ 28.) At this point, Plaintiff's surgery was aborted and he was taken by stretcher to receive CT scans in order to assess his injuries. (*Id.* ¶ 30.) The CT scans showed left and right maxillary sinus fractures. (*Id.* ¶ 30.) Thereafter, Plaintiff was returned to the OR in order for the needle and mesh, which at that point were still in his abdomen, to be removed. (*Id.* ¶ 31.)

On January 18, 2018, Plaintiff returned to the OR and successfully underwent the hernia surgery. (*Id.* ¶ 34.) The following day, January 19, Plaintiff received a traumatic brain injury evaluation, which revealed that Plaintiff had post-concussive symptoms, facial pain, headaches, and difficulty with full-sentence recall. (*Id.* ¶ 36.) Plaintiff was discharged from Penrose later that day. (*Id.* ¶ 37.)

---

[1] *Trocar*, MEDICAL DICTIONARY – THE FREE DICTIONARY, https://medical-dictionary.thefreedictionary.com/trocar (last visited Jan. 13, 2020).

Plaintiff subsequently developed chronic pain in his shoulder, face, jaw, and neck. (*Id.* ¶ 38.) In February 2018, he was put on a 12-week physical therapy plan in order to mitigate this pain. (*Id.* ¶ 39.) In March 2018, Plaintiff was diagnosed with swelling in the extremities and a sinus infection, the latter of which occurs frequently after maxillary sinus fractures such as those suffered by Plaintiff. (*Id.* ¶ 40.) In April 2018, Plaintiff had his physical therapy regimen increased to two times per-week. (*Id.* ¶ 41.)

In May 2018, Plaintiff received an MRI on his right shoulder, due to increasing pain and limited mobility. (*Id.* ¶ 42.) That MRI showed "partial articular surface tearing, acromioclavicular joint arthrosis, and a small amount of additional fluid in the subacromial subdeltoid bursa." (*Id.* ¶ 43.)

As a result of Plaintiff's fall from the operating table, Plaintiff to date "has difficulty with normal functions, including inability to sleep and eat adequately." (*Id.* ¶ 44.) Also as a result of Plaintiff's fall, Plaintiff "was forced to miss a substantial amount of work," and at least for a time was "incapable of performing work around his house." (*Id.* ¶¶ 45–46.)

Plaintiff brings medical negligence claims against Bordelon, Burkholder, and Williams; negligence claims against Mason, Carris, Meyer; and a corporate negligence claim against Penrose. (ECF No. 1 ¶¶ 51–91.) At some point during the pendency of this litigation, however, Plaintiff settled with Penrose, Mason, Carris, and Meyer. (ECF No. 45 at 7.)

B.     **Plaintiff's Motion**

In Plaintiff's Motion, he seeks to allege an additional claim against Bordelon. Through what is commonly referred to as the "captain of the ship" ("COS") doctrine, Plaintiff now seeks to impose vicarious liability on Bordelon for the alleged negligence of the other individual Defendants present in the OR during Plaintiff's surgery. (*Id.* at 9–13.)

The Scheduling Order entered by United States Magistrate Judge Kathleen M. Tafoya prescribed a Deadline for Joinder of Parties and Amendment of Pleadings of August 28, 2019. (ECF No. 24.) Plaintiff filed his Motion to Amend the Complaint on November 27, 2019, nearly three full months after the deadline to do so. (ECF No. 42).

## II. ANALYSIS

Because Plaintiff's Motion was filed after the Scheduling Order deadline, Plaintiff must show "good cause" for seeking modification of the Scheduling Order under Federal Rule of Civil Procedure 16(b)(4). *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014). Plaintiff also must satisfy Federal Rule of Civil Procedure 15. *Id*. The Court finds that Plaintiff has failed to demonstrate good cause under Rule 16(b)(4) for amending his Complaint, and as such, his Motion to Amend the Complaint will be denied.

As Plaintiff recognizes, Rule 16(b)(4) "requires [Plaintiff] to show the scheduling deadlines cannot be met despite [Plaintiff's] diligent efforts." *Id.* "Rule 16's good cause requirement may be satisfied, for example, if a plaintiff learns new information through discovery or if the underlying law has changed." *Id.*

5

Plaintiff argues that information recently learned through discovery excuses the lateness of the amendment he seeks.  (ECF No. 42 at 7.)  In particular, Plaintiff points to 1) information obtained from Bordelon's November 13, 2019 deposition (*id.* at 2); 2) information obtained from Williams' November 15, 2019 deposition (*id.* at 3); and 3) a "Surgical Preference Card" ("SPC") disclosed by Penrose, Mason, Carris, and Meyer on October 23, 2019 (*id.* at 4).

Plaintiff argues that this newly discovered evidence revealed the previously unknown facts (or bases for the legal conclusion) that Bordelon "had the right to control the nursing staff with respect to [Plaintiff's] positioning and security, . . . had assumed control and direction of the operating room when [Plaintiff] fell," and therefore that he was the "captain of the ship," and "is vicariously liable for the acts and omissions of the surgical team." (*Id.* at 5.)  Plaintiff argues that because this information was discovered past the deadline set out in the Scheduling Order, there is good cause for his untimely attempt to amend the Complaint.  (*Id.* at 6–7.)  The Court disagrees.

**A.     Plaintiff's Newly Discovered Evidence**

   1.     <u>Bordelon's Deposition Testimony</u>

At his November 13, 2019 deposition, Bordelon testified in relevant part as follows:

> **Q**:   With your preference card, you have the ability to control what the nurses do to some extent before surgery; is that true?
>
> **A**:   I do have the ability to control some of what they do but, again, I do not have supervisory capacity over them.

6

. . .

**Q**: So, absent a nurse's fear that you would do the wrong thing, that you would harm the patient, again, with patient safety being the Number 1 thing on mind, absent those circumstances, if you asked a nurse to do something in the operating room during surgery, would expect him or her to do that?

**A**: Typically I would. It doesn't always happen.

. . .

**Q**: And so in terms of passing instruments, those are things that you are directing the [physician assistant (here, Williams)] to do?

**A**: Yes.

**Q**: Okay, and he is under your supervision?

**A**: Yes, he is under my supervision.

. . .

**Q**: And it was your decision to adjust the trocars, right?

**A**: Yes.

**Q**: And although you didn't physically adjust the trocars, you were dictating to somebody to do that, true?

**A**: Yes.

. . .

**Q**: And I'm not asking specifically about that. I'm asking in general. [Plaintiff] is prepped for surgery based in part on your preference on the surgery card, right?

**A**: Yes.

**Q**: During surgery, [Plaintiff] is repositioned on the table at your direction, right?

7

>
> **A**: That is correct.
>
> **Q**: During surgery, the trocars need to be repositioned, which is done at your direction, true?
>
> **A**: Correct.
>
> **Q**: And, after all of that, [Plaintiff] fell off the table, correct?
>
> **A**: That's correct.

*Id.* at 2–3.

    2.    <u>Williams' Deposition Testimony</u>

At his November 15, 2019 deposition, Williams testified in relevant part as follows:

> **Q**: In your experience working in the operating room as an anesthesiologist alongside general surgeons, again, in your experience, if a surgeon gives orders before or during surgeries, would you expect those orders to be followed?
>
> **A**: Within reason, yes, so if it's a reasonable request, you would try—anyone in the OR would try to accommodate the surgeon to make it easier, more accessible for them to perform the job that they're doing.
>
> . . .
>
> **Q**: Before surgery, who determines how a patient will be positioned for a given surgery?
>
> **A**: The surgeon puts their request for the position for that surgical case in the booking form that they fill out beforehand, is my understanding.
>
> . . .

> **Q**: So based on your experience in looking at these forms, if a surgeon, absent some concern for safety, wants a patient positioned in A Position versus B Position, the surgeon can direct that? Is that fair?
>
> **A**: I think that's correct, yes, because they know what they're going to need for access during surgery so, therefore, they're the ones that would make the request for the position that would be needed.
>
> . . .
>
> **Q**: Okay, and who is in charge of direction that the patient be repositioned?
>
> **A**: The surgeon requests it, you know, and in this case as well, but, you know, you mentioned is it common. With every appendectomy, every cholecystectomy, for those patients you do—their position is—they're supine but their position is changed during the course of the operation.
>
> . . .
>
> **Q**: Nevertheless, in the operating room if [Bordelon] gives the nurses an[ ] instruction or asks them to do something or tells them to do something that . . . would not cause or potentially cause harm to the patient, you would expect the nurses to follow that direction based on your experience in the OR, true?
>
> **A**: Yeah, within reason, yes.

(*Id.* at 3–4.)

3. <u>The SPC</u>

As previously mentioned, on October 23, 2019, Penrose, Mason, Carris, and Meyer "disclosed Defendant Bordelon's [SPC] for [Plaintiff's] surgery." (*Id.* at 4.) The "[SPC] is a document that surgeons use to direct and instruct the surgical team." (*Id.* at 4.) "The [SPC] is tremendously detailed, right down to the type of sutures, gowns, and

9

forceps that Defendant Bordelon wanted to use during [Plaintiff's] procedure. It also addresses patient positioning." (*Id.* at 4.)

Plaintiff also asserts as follows with respect to the SPC:

> In the section [of the SPC] labeled "Preference Card Positioning Information" Defendant Bordelon direct the staff with respect to [Plaintiff's] positioning and security. He directed the staff to place [Plaintiff's] arms "tucked at side," legs "straight," body "supine," and to use a "cloth tape" safety strap.

(*Id.* at 4.)

Plaintiff argues that the SPC demonstrates that "Bordelon had the right, authority, and means to control each and every aspect of [Plaintiff's] positioning and security during surgery." (*Id.* at 4.)

B.     **The "Captain of the Ship" Doctrine**

The COS doctrine was established, as a matter of Colorado law, by the Colorado Supreme Court in *Beadles v. Metayka*, 311 P.2d 711 (Colo. 1957) (en banc). The facts of *Beadles* are remarkably similar to those of the instant case:

> [T]he plaintiff had been placed [on his back] on the operating table and had been rendered unconscious by anesthetic. . . . The [anesthesiologist] was engaged in checking respiration, pulse and other related matters concerning the patient and making a record thereof. An orderly . . . was at the foot of the operating table, and the [anesthesiologist] was at the [plaintiff's] head.
>
> [The surgeon] entered the room and, although not being fully gowned and requiring a nurse to tie his gown, gave orders to place the patient on his side, which the orderly proceeded to do. The orderly was holding the plaintiff by the hips in the position as directed when he was then told to "get a strap' or "strap the patient." Whereupon the surgeon turned to have his gown tied, and the [anesthesiologist] turned her head and began making entries on the chart. The orderly left the

10

>side of the operating table to get the strap as directed. The
>patient then fell to the floor and was injured.

*Id.* at 712–713.

In *Beadles*, the defendant surgeon "admit[ted] that as the chief surgeon he was in command during the operation, but contends that his responsibility did not begin until the start of the operation." *Id.* at 713. The court explained that "[u]nder the admittedly complex activity in an operating room it cannot be stated as a matter of law the exact moment at which the responsibility of the surgeon begins. . . . [T]he point at which the surgeon assumes supervision and direction in the operating room is the crux of the problem, not the time when he begins to operate on the patient." *Id.* at 713.

The court approved of the following instruction that was given to the jury at trial:

>You are instructed that *in the operating room the surgeon is master*, and has exclusive control over the acts of the orderly and nurse, and is responsible for the negligence, if any, of the orderly or nurse, during the time the patient is being prepared for the operation in the operating room in accordance with the instructions of the surgeon, and in the presence of the surgeon.

*Id.* at 714 (emphasis added).

The court did note that it could "perceive some situations to which the [jury] instruction would not apply as a general proposition of law[,] [b]ut [that] the [trial] court was instructing the jury with this particular state of facts in mind." *Id.* at 714.

Given the above, and contrary to what Plaintiff seems to suggest, the dispute in *Beadles* with respect to the COS doctrine did not center around whether an operating surgeon, as a general matter, has control over the operating room staff. *See id.* at 712–714. That was assumed to be true by the court. *See id.* at 712–714. Rather, the

11

question the court grappled with in *Beadles* was whether the surgeon had become the COS *prior* to actually beginning the surgical procedure. *See id.* at 712–714. By approving of the trial court's jury instruction quoted above, the court held that the surgeon, at least while he was actually conducting the operation, had control over the OR staff as a matter of law, such that he could have been held vicariously liable for the negligent acts or omissions of the OR staff that may have occurred during that time.

In other words, under *Beadles*, the operating surgeon should presumptively be understood, at least once he or she has begun to physically operate on the patient, to have direction and control over the OR staff. Indeed, in a similar case, *Krane v. St. Anthony Hospital System*, 738 P.2d 75, 76–77 (Colo. App. 1987), a division of the Colorado Court of Appeals stated: "[T]he alleged negligent act of the surgical nurse took place over two-and-one-half hours into the surgery, so there can be no factual dispute that the operating surgeon had assumed control."

**C.     Good Cause**

The Court concludes that based on the above-cited case law, applied to the allegations in Plaintiff's original Complaint, a diligent litigant under these circumstances should have known that a COS claim against Bordelon was available at the outset of this litigation. As a consequence Plaintiff has failed to demonstrate good cause under Rule 16(b)(4) for the late amendment to his Complaint that he seeks.

Plaintiff asserts in his Motion that Bordelon's deposition testimony revealed the previously unknown bases for the legal conclusions that: "[A]s the lead surgeon . . . [Bordelon] had the right to control the surgical team; . . . the authority to direct the surgical team with respect to patient positioning and trocar adjustment during surgery;

12

and that he had assumed control and direction of the operating room at the time [Plaintiff] fell." (ECF No. 42 at 2.)

Similarly, Plaintiff avers that Williams' deposition testimony "confirmed that Defendant Bordelon had the authority and control to direct the nursing staff during surgery" (*Id.* at 3); and that the SPC revealed that "Bordelon had the right, authority, and means to control each and every aspect of [Plaintiff's] position and security during surgery" (*Id.* at 4).

However, it is clear from the allegations in Plaintiff's Complaint that at the time the Complaint was filed, and thus *ipso facto* before the Scheduling Order's deadline to amend, Plaintiff was aware that 1) Bordelon was the primary and operating surgeon for Plaintiff's surgery, and 2) that Plaintiff fell from the operating table *during* the surgical operation. Specifically, Plaintiff alleges in his original Complaint that "Bordelon was the primary surgeon for [Plaintiff's] hernia surgery" (ECF No. 1 ¶ 19), and that "*[d]uring the surgery*[,] [Plaintiff] was rolled slightly to his right and placed in a slight Trendelenburg position." (*Id.* ¶ 26 (emphasis added).) Plaintiff alleges that before the operation had been completed (*Id.* ¶¶ 27, 31, 34), he fell from that position off of the operating table. (*Id.* ¶¶ 27–28.)

Under Colorado law, the operating surgeon is presumptively the COS at the time he is conducting a surgical procedure. *See Beadles*, 311 P.2d at 713–714; *Krane*, 738 P.2d at 76–77. The Court therefore concludes that a diligent litigant in Plaintiff's position would have known that a COS claim against Bordelon was available from the time the complaint in this action was filed. Accordingly, Plaintiff has failed to demonstrate good cause under Federal Rule of Civil Procedure 16(b)(4), and his

Motion must be denied.

## V. CONCLUSION

In accordance with the foregoing, the Court ORDERS that Plaintiff's Motion to Amend the Complaint (ECF No. 42) is DENIED.

Dated this 16th day of January 2020.

BY THE COURT:

William J. Martinez
United States District Judge